And we will take up United States v. Jones. Your Honor, I have instructed Mr. Jones, Mr. Jones, and Mrs. Mott to come to the podium. Okay, counsel, maybe what we should do, you should, why don't we take a minute, you can talk with your client, and then present what issue you think is. Your Honor, before the argument begins, if I could briefly state that this is a longstanding issue that Mr. Jones has had, and I would prefer to speak with him following the argument because I don't think it's actually germane to anything that's been raised, it's not directly germane. But if you'd like me to go through with him now, I certainly would do so. Well, I think, and I also think you should advise him that anything he wanted to convey to us, he should put in writing and have you submit. That's right, Your Honor, it is a long story. I have written material. Mr. Jones. Yes, please sit down and let your counsel make your arguments. My name is David Schlesinger, and as you've just heard, I am appearing on behalf of Appellant Willie Jones, Jr., and I do apologize to the Court for that brief interruption, but let me get right to the issues, if I may. With the Court's indulgence, I would like to first start with Mr. Jones' pretrial Faretta invocation, or attempted Faretta invocation, and then transition to his irreconcilable conflict issue regarding his three unsuccessful attempts to have David Zuckman substituted out as his trial counsel. Time permitting, I would then like to discuss Mr. Jones' reasonable suspicion argument. Just so that I'm clear, and maybe for Mr. Jones' benefit, there aren't any Brady claims raised below or on appeal, right? That's correct, Your Honor. They could be raised in an appropriate vehicle later on in some post-conviction motion. Certainly, if Mr. Jones is unsuccessful on direct appeal, he's welcome to raise Brady via . . . So we're not ruling on those two? No, he would do a section 2255. That's correct, Your Honor, and Mr. Jones is certainly welcome, if he's unsuccessful on direct appeal, to raise those issues in a 2255 motion in district court. Just to address Judge Herz's point more directly, Mr. Zuckman did raise a Franks v. Delaware issue. He made a motion under Franks v. Delaware regarding what I would consider to be Mr. Jones' overriding issue, and that is that Mr. Jones . . . And it's clear that there is a discrepancy between the testimony that Border Patrol agent Joseph Kratt gave at Mr. Jones' evidentiary hearing and the deposition testimony of the material witnesses regarding whether Border Patrol agent Kratt had actually questioned the material witnesses regarding the circumstances of their being transported close to the border checkpoint. So that is essentially . . . Is that at all material to anything? I'm sorry, Your Honor? Is that at all material? Well, it's not . . . I mean, it just seems to me that it's so obvious that there was reasonable suspicion without regard to . . . We're talking about the reasonable suspicion to stop and detain Mr. Jones, and then they found the three people he dropped off. If they had disappeared from the face of the earth afterwards, so what, in terms of the reasonable suspicion? We have not raised that issue, Your Honor, as you can see in the briefing, as part of the reasonable suspicion analysis. The reasonable suspicion analysis, if you'd like me to address it to begin, is more related to whether the Border Patrol agents had reasonable suspicion to stop and detain Mr. Jones based solely on a tip that . . . Why does that make a difference in this case? Let's just assume for purposes of our discussion that the detention was illegal. How would that affect his conviction? You're not making any argument that anything introduced at trial where he didn't get a There was no seizure of evidence during that detention. So you may have a 1983 claim or a Bivens claim for the detention, but why would it affect the conviction? Well, everything that followed in this case stemmed from that detention. No, it didn't. They went out and they found the three guys. They did find them, Your Honor, but they otherwise would not have had any reason absent that tip . . . Let's assume the police arrest me illegally. Don't have any reason to. And then, later on, get a videotape of me committing a crime. Are you saying they can't prosecute me for the crime because they arrested me illegally? I mean, it depends on . . . No fruit of the poisonous tree argument. They didn't . . . In your case, they didn't . . . was not dependent on whether or not Mr. Jones was detained. And, in my case, they found the videotape because somebody else mailed it in. You may have a great illegal arrest claim, but I'm having difficulty figuring out how that affects the conviction. Well, it was certainly . . . Undoubtedly, as I would acknowledge, they had complete discretion to conduct an investigation based on the tip and arrest and detain the three material witnesses. And then the evidence at trial is not dependent on his detention, is it? Well, some of it was, Your Honor, because in . . . What was? Well, there were some . . . what are . . . different kinds of weeds that were found in . . . Inside the car. That's correct, Your Honor. They were found during secondary? They were found most completely following Mr. Jones' detention, which happened very soon after the car was returned to secondary. He wasn't charged with anything to do with the weeds, was he? Well, the weeds themselves were not illegal, Your Honor. Right. I understand. See, he wasn't . . . but he was tried for transporting the three individuals. That's correct. So, maybe they found stuff that was irrelevant when they kept him, and maybe he's got a claim against the government for that. But how did that affect the fairness of his trial? It didn't specifically affect the fairness of the trial, per se, Your Honor. What it did affect was the ability of the government to collect evidence of the weeds in the car. Mr. Jones' two cell phones were then seized. One was searched. So, but for Mr. Jones . . . Were those . . . was the evidence from the cell phones and the weeds introduced as evidence at trial of his guilt? It was, Your Honor. Okay. Secondly, the cell phone evidence was introduced at great length, including cell phone location data obtained from his Samsung flip phone. The government was unable to search Mr. Jones' iPhone because it was password protected. But from the flip phone, they were able to obtain a trove of evidence that the government used circumstantially to prove that Mr. Jones . . . I don't find that anywhere in your briefs. That's why I'm asking. Well, we did make a generalized Fruit of the Poisonous Tree argument, but I'm hopefully fleshing it out for Your Honor to give you a sense that there was considerable evidence seized as a result of what we claim was an unconstitutional detention of Mr. Jones. If I may turn to the Feretta issue, Your Honor, if there are no further questions regarding reasonable suspicion. I have one other question about it. Certainly, Your Honor. So, part of the reasonable suspicion involved the license, driver's license showing a non-local address. Would the police have been able to look at the license if they had not detained him and sent him to secondary? Your Honor, we acknowledge that the Border Patrol agent, as part of his ordinary procedures, would have been able to examine Mr. Jones' license. That's not part of it. So, it's really the cell phone data and the weed that was later linked to the migrant's clothing. That's correct, Your Honor. Those are the principal . . . And, of course, the migrants would have been inevitably discovered, whether they stopped him or not. We acknowledge that, Your Honor. We acknowledge that the material witnesses could have been separately charged with having entered the United States at a place other than a port of entry under Section 1325. So, that's not an issue that we . . . No, no, but they would have been discovered, whether they stopped him or not, because of the information that was provided by . . . That's correct, Your Honor. We acknowledge that. Again, if there are no further questions on this issue . . . I'm interested in hearing your Fred argument. Certainly, Your Honor. Let me just ask you to focus on this. There were a number of changes of counsel. That's correct, Your Honor. I understand why. You must be about the seventh lawyer in the case. I am the sixth CJA appointed attorney representing . . . At some point, the judge said, gee, you keep changing lawyers. Mr. Jones, do you want to represent yourself? And, he said no. And then, on the day of trial . . . It's pre-trial. A forerunner request is made, correct? That's correct, Your Honor. There were two prior occasions. There's one post-trial and one pre-trial. But, there were two prior occasions before the day of trial when Mr. Jones was asked by the district court whether he wished to represent himself. And, he said no. Given that set of facts and the fact that the request . . . He said no consistently up until the day of trial after a bunch of substitutions. Why did the judge abuse his discretion in concluding that the request was made for purposes of delay? Well, first of all, Your Honor, I note that you . . . Your question seems to presume that this court has an abuse of discretion in the forerunner context. I've noted in the briefing that it's not entirely clear what standard of review this court applies to. But, a court can turn down a forerunner request if it's convinced that it was made for purposes of delay. Can it not? Yes, Your Honor, but . . . Let's assume we review that de novo, not for abuse of discretion. Why wouldn't we uphold the judge's conclusion here? Well, first of all, it would have to be exclusively for purposes of delay, Your Honor. As opposed to inexclusively? Well, as opposed to having a mixed motive, Your Honor. Now, Mr. Jones did invoke FRERETA and concomitantly seek continuance, but there's nothing under this court's case law that suggests it's per se unreasonable to seek continuance in concert with FRERETA. Indeed, I note that . . . No, but these were repeated. You're the sixth, so there were five others, and four times they were replaced. There were these repeated efforts to replace counsel for what would appear to be, quote, conflicts, close quote, that essentially were created by your client. And he's asked each time whether he wants to represent himself. He says no, and then finally, you know, he decides that he does want to represent himself, and then he wants to delay the trial further, which . . . and he had previously not even shown up at one point. I mean, I don't understand. At some point, a judge could conclude that this was all being done for the purpose of . . . this was the final request that you're talking about was all for the delay. I think you'd have to . . . and I understand Your Honor's concern. I think you have to look at all this in its totality. Mr. Jones had three times attempted to have Mr. Zugman substituted out as his counsel, and the district court all three of those times denied that request. Faced with that, faced with having to go to trial with someone with whom he deemed himself to have an irreconcilable conflict, he finally decided, and you heard today firsthand, Mr. Jones has a steadfast and passionate belief that this, what he terms a Brady issue, what I think is probably more akin to a Franks issue, is the overriding and most important issue in this case. But wasn't he asked, and I know there are so many requests in this case that it may be confusing one with the other. Wasn't he asked at some point after the court declined to remove counsel whether he'd like to represent himself, and he said no? There were two occasions, Your Honor, when that did happen. So that if he, see, and when you combine that with waiting until the day of trial to say, no, I've changed my mind, now I do want to represent myself. He knew well before trial that he was going to be stuck with this counsel that he wanted removed, right? He certainly should have had a suspicion that he might have been stuck with Mr. Zugman. Well, the judge said, I'm not going to grant your motion. Would you like to represent yourself? And he said no. Not just a suspicion, he had knowledge. At that point, and I'll refer the court to, and I would like to reserve some time for rebuttal, but if I could briefly address your question, Your Honor. It's at ER 570, Mr. Jones stated in response to the court's inquiry, district court's inquiry, whether he would like to perceive, per se, Mr. Jones deemed himself to be disadvantaged by having to do that. So we would view this as simply Mr. Jones's, you know, faced with the reality of trial being imminent, you know, the jury was about to be impaneled on November 7th, 2017. Faced with that imminence, he finally decided that he wanted to invoke his right to proceed pro se. You've heard today Mr. Jones's, you know, what I would term his steadfastness and passion about this issue. This might be a rare case in which the defendant might have been better off proceeding pro se than being able to bail himself. Are you serious? I do, Your Honor, because when you look at the history of this case, you know, Mr. Jones obviously deemed himself not to be adequately represented by any of his counsel regarding that particular issue. Well, but, you know, he probably don't, he obviously doesn't think you're representing him adequately. In fact, I'm waiting for the motion. Well, I would note. I mean, I see his wife is shaking his head yes. I have a duty of loyalty to Mr. Jones. No, I understand that. But I will refer the court to the docket in this case, the Ninth Circuit docket in this case. I did make a motion to withdraw and Commissioner Shaw denied it. If there are no further questions, I'd like to reserve my brief remaining time. Can I ask you a quick question? Certainly, Your Honor. Since he served his sentence. He has, Your Honor. So that takes care of two issues that you raise. One regarding how the sentence was calculated by the district judge and also your post-Ferretta argument. Yeah, we are prepared to submit on the post-trial Ferretta argument. I don't mean submit. I mean it's moot. Well. Because the only thing that happened post-trial was the sentencing, and he served his sentence. We do note, and the government itself conceded this in a footnote in their brief on page 57, footnote 8, and we agree with their analysis that the minor role issue presuming that Mr. Jones is, well, even if his conviction is not reversed, he still is serving a term of supervised release. Yeah, but there are. Right, the entire case is not moot. We agree with that. Okay. We agree with that. Yeah, no, I don't think that the entire case is moot. I was asking about two issues. But the minor role issue under Section 3B1.2b is not technically moot. Why not? It's not technically moot, and to describe the government's analysis, or to quote from their brief, is that under this court's precedent, the challenge to the length of Jones' sentence of imprisonment will not be mooted because the sentence includes a period of supervised release, and the district court has discretion according to the length of supervised release, and the government cites the United States v. Allen, 4-34-3-11. Yeah, and when the brief was written, that was correct. Is supervised release, the period of supervised release ended yet? It is not, Your Honor. It began after Mr. Jones was officially released from the custody. And when does it end? It will end in approximately, if it's not terminated early, it will be March of 2022. Thank you. If there are no further questions, I'd be pleased to turn over the podium to Ms. Braun. Okay. Thank you, counsel. May it please the Court, Megan Braun on behalf of the United States. Perhaps we could start with the Feretta motion, which is where my friend spent a lot of his time. The government does not think that the standard of review is unclear as to the issues presented in this case. The Ninth Circuit's case law is clear that where the district court makes a finding that the defendant's motion is for purposes of delay, that that is a factual finding that's reviewed for clear error. We argue that in our brief. That was the one on the day the trial was about to begin. Correct. This is as to his pretrial Feretta motion made on the morning of November 6, 2017, which is his third trial date, and he makes a motion while the jury is waiting to be brought in. We think it's clear from the face of the record that that was not clear error on the part of the district courts, given the long pattern of dilatory conduct in this case and the fact that he has twice previously been asked if he'd like to represent himself. We also think under the facts of this case, though, one of the strange things is the judge denies the motion but continues the trial. Right. Sorry. He denies the Feretta motion and continues the trial? Yes. No, that trial date is not continued. That is his third trial date, and he does go to trial after the court denies the motion. Right. It's an earlier. Okay. No, I'm good. Yeah. I mean, it's confusing because there are several trial dates. Yeah, that's right, because if the judge had continued the trial, then there would be no reason to argue about delay. Right. I think Your Honor is referring to the September trial date, which that's where the defendant refuses to leave his holding cell, and the court chooses to continue the trial to hold a compensation. But he doesn't make – that's why I was asking counsel about – he didn't make a Feretta request there. Correct. He did not make it in September. He makes it for the first time in November, and the court says, you know, this is the third time you've had a trial date. This is the second time the jury pool is waiting to be brought into the courtroom. The district court walks through the history with the prior counsel. I think it's significant that on at least three prior instances in this case, the court made a finding the defendant was – his actions were for the purpose of delay. Two of those had to do with substitution motions, and one of those has to do with his refusal to leave the holding cell on the morning of the September trial date. So based on that, we think that there's strong evidence of a purposeful delay, and the defendant has fallen short of the burden of establishing clear error on that point. On the substitution, I mean, I'm happy to take further questions on – No, no. Thank you for clearing that up, because there were – there were two trial dates in which the jury was ready and there to go, but the request – Feretta request was made the second time. Correct, correct. On the substitution point, you know, the defendant devotes a lot of attention to this in his brief and suggests the district court didn't inquire as to what is the cause of the breakdown in communication. The government asserts that the breakdown in communication is not enough. He has to point to legitimate grievances. As in all relationships, communication breakdowns between attorneys and clients don't happen spontaneously. They're caused by some other conflict, and here we think the district court was correct to focus on the basis for that conflict, and we think the record is very clear about why there is a conflict between – disagreement, why the defendant is dissatisfied, and I think it's most clear if the court looks to the written substitution motion that Mr. Zugman files in advance of this hearing. That motion has three parts. He makes the request for new counsel. He points to the fact that the defendant is dissatisfied and he alleges a communication breakdown, and then it goes on to explain the two bases of disagreement. One has to do with the defendant's bond revocation, and the defendant came to view that he had received bad advice from counsel about how to handle that matter, and the second has to do with the allegedly false statements, and the government would be happy to address both of those in detail, but we think it's clear that the district court correctly concluded those are baseless grievances. We also think it's significant that at the October hearing where the defendant is present, his oral representations to the court confirm the two bases in the motion. So at page 17 of the transcript, the court asks the defendant why he's making the motion, and he starts by pointing to dissatisfaction about the handling of the allegedly false statement, and then the final page of this transcript, which is at ER 22, he says, what about my bond? That is the issue about the reason why I wanted to have a different attorney because I was violated on that part. So he's again clear that the reason he's dissatisfied is because of the bond revocation. That wasn't discussed at great length in the government's brief, but just to provide a little bit more context, the defendant was arrested in June of 2017. He is then released on pretrial release. He spends about a year on pretrial release, and then in June of 2017, he fails a drug test. The drug test shows up positive for marijuana, and the defendant immediately admits the violation as probation officer and says, yes, I ate a marijuana brownie. The district court says, you know what, I'm going to give you a pass on this one. People often get confused about federal versus state law requirements, but you can't have marijuana. He then fails four more drug tests in the span of five weeks, and at that point, at the bond revocation hearing, counsel does advise his client that, you know, it would be fruitless to try to contest the validity of the test, so I recommend that you admit the violations and ask the court for mercy and ask it to let you remain out on bond. There's no indication that that was bad advice on the part of counsel. What happened? So the district court does revoke the defendant's bond at that point, and if the court is interested in this, the bond revocation hearing, they're not in the record on appeal, but they're at dockets 134 through 136 of the district court, where the district court explains that it's revoking the defendant's bond given the number of violations. The defendant says that he wanted to argue that the subsequent failed drug tests were because of drug residue from the marijuana brownie he consumed the first time, but the record, if the court were to look at that, makes clear that the toxicologist who screens these reports is screening for new versus residual use, and the toxicologist found that these subsequent violations indicated new use. I'd also like to touch on the false statement, the allegedly false statement by the Border Patrol agent. Well, here's the problem, I guess. If there's no Frank's issue raised on appeal and we're not going to let Mr. Jones talk about this, I'd prefer you didn't either. Yeah, I don't think you should talk about it. I think it may be the subject of a 2255 petition, or we're going to see another motion to substitute, and I don't think it's relevant to any of the issues on appeal. Well, I mean, the reason I was going to bring it up is because this is one of the reasons he states for his dissatisfaction with counsel, and so it's one of the basis he sets for his substitution motion. So I'd be happy to discuss it with the court. But the judge didn't deny it. See, the judge didn't deny it on that basis. So, you know, let's not talk about it. I'm happy to move on. In terms of the reasonable suspicion, we think that there is ample evidence in the record to establish reasonable suspicion. The motorcyclist gives a credible in-person tip about observing three people disembark from a vehicle immediately in front of the Border Patrol checkpoint. And what was the evidence that those three people were illegally trying to cross into the country? So at the time that the motorcyclist makes the tip, he doesn't say that these are aliens. He doesn't even speak to their ethnicity. And so there's no facts that indicate to the Border Patrol agent that they are aliens. However, the agent draws on his experience as a Border Patrol agent and says at this time, there's a trend in this area of smuggling cartels trying to circumvent the checkpoint by dropping people off in advance of the checkpoint, having them hike around it, and then picking them up on the other end. Where is the checkpoint? I beg your pardon? Where is the checkpoint? The checkpoint is on Highway 94 in Hamul. So it's about 20 miles north. In where? In Hamul. J-A-M-U-L. I think that's how we say it. Twenty miles north of the border. Twenty miles north of the checkpoint. And how far from the checkpoint are the three people dropped off? They're dropped off a quarter mile to a third of the mile before the checkpoint, just before a bend in the road. So while they're not visible. Can you picture this area? Because I'm familiar with the checkpoints on 405 and 15. Like, where is that in relation to this? So this is far, far south of that. So this is south of the city of San Diego in that kind of expanse between the city of San Diego and the United States-Mexico border. Tecate is probably 10 or 15 miles east of the coast. So if you've been driving out towards Yuma, that's where the Tecate checkpoint is. And there's three checkpoints on the border in San Diego County, and that is one of them. And they jump over the fence in Tecate, the aliens. They then walk to Highway 94, where they are picked up by the defendant. And then they drive in the car, and they're stopped at the checkpoint, which is about 20 miles north of the border itself. But the actual getting out of the car is within close proximity to the checkpoint. Very close proximity. And after, the aliens observe a sign indicating that there is a Border Patrol checkpoint that is open in front of them. So we think this was more than enough for reasonable suspicion. Can you speak to the length of the detention? The length of the detention was not challenged below. And therefore, it's not discussed a great length at the suppression hearing, and it hasn't been challenged before this court. But the record indicates that the defendant was held for approximately one hour. He stops at the checkpoint at 145, and he's officially arrested at 245 p.m. This court does not have a temporal litmus test for what. No, but obviously you couldn't keep somebody for a week. Of course, yes. Here it's an hour, and we think that the evidence indicates that's a reasonable amount of time, given that the canine officer needs to get in his truck and head down the road. He proceeds past the spot where they are allegedly dropped off so his dog can get downwind of where the persons are suspected to be. And then using standard Border Patrol techniques, they zigzag through this very dense brush along the road. So it takes him about a half an hour from when he gets out of his car to find the aliens, and then they need to have someone come pick up the aliens, put them in a squad car where they can be safely transported. So it's another 15 minutes from when he finds them until he gets back and is able to arrest, formally arrest the defendant. Can you speak to the post-trial Fureta issue? Is it moot? The government has not taken the position that the post-trial Fureta motion is moot. Because had he been able to represent himself, he might have gotten a shorter term of supervised release or a different term. He could have potentially argued that. On the post-trial Fureta motion, under this court's precedent, prejudice is not assumed. For pre-trial Fureta motions, if the district court incorrectly denies it, the court will presume prejudice. But the court does not presume prejudice for post-trial Fureta motions, and the defendant hasn't made any representations that he is prejudiced. The supervised release is not dependent on how the guidelines are calculated. That is correct. Basically, they're a result of statute that's not dependent on how the guidelines for the offense are calculated. That is correct. So here he has a, I think it's a Category D felony, where the guidelines recommend one to three years of supervised release, and the district court chose to give him a three-year term of supervised release. So we don't think that the, you know, if he gets a two-point reduction for a minor role reduction, that would affect the sentencing calculation. And we make, we point that point in our brief. So your argument is not that it's moot, but that there's no prejudice from the denial? So our argument is that, one, it's not moot. Two, there's not much of a practical difference. If the court were to reverse on the minor role reduction, it would be remanded, because that wouldn't affect the calculation. And as to the post-trial Fureta motion. You think it was correctly denied? We think it was correctly denied, and we think even if it wasn't, the defendant hasn't shown that he was prejudiced by the denial of that motion, because he hasn't shown that he would have received a more favorable sentence if he had represented himself. If the court has no further questions, the government would ask that you affirm. Thank you. All right. Thank you, counsel. I'll give you another minute, even though you're out of time. I'd like to briefly address the standard of review issue for Fureta. Ms. Braun is correct that the finding regarding dilatoriness would be reviewed for clear error. That's plain in this court's case law. However, the overriding standard of review is an open question in this court, and United States v. Thompson and United States v. Kaczynski noted that that is an unsettled question in this court's jurisprudence. Expanding on that, what I would like to note in United States v. Furetas, this court noted that it did not express, citing the page 618, fed 3rd of 1055, we expressed no opinion on whether after finding that a defendant seeks to proceed pro se for the purpose of delay, the district court may refuse to grant the defendant additional time to prepare. So in that regard, even if this court were to affirm the dilatoriness finding, it's still an open question under Furetas regarding whether the overall Fureta claim should have been denied categorically. That's different. If you grant the Fureta claim, you should give somebody additional time to prepare, right? Ordinarily, Your Honor, although sometimes defendants will insist that they can go to trial immediately or substitute in very smoothly. Oh, I see. So you're saying the district court should have said, even if you're making this for purposes of delay, I'll grant your motion and I'll give you a short continuance. That's correct, Your Honor, and that's what we're saying that Furetas has explicitly said is an open question in this court's case law, is that the dilatoriness finding is not sufficient. The district court could not rest on that entirely, that there still had to be a greater inquiry regarding Fureta rights. That was not a case, was it, where the jury was there and waiting? No, Your Honor, the jury had not yet been impaneled. So under Furetas, it was a timely invoked Fureta invocation. If there are no further questions, I'd be pleased to submit. All right, thank you, counsel. United States v. Jones is submitted, and this session of the court is adjourned for today. All rise. This court for this session stands adjourned.
judges: Wardlaw, Hurwitz, Korman